UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| MARSHALL JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:05-cv-85-WGH-RLY |
| | ) | |
| STYLINE INDUSTRIES, INC., DONETTA ABEL. | ) | |
| JEFF ECKERT, and SHEILA HARRIS, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

### Introduction

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, on Defendants' Motion for Summary Judgment filed August 16, 2006. (Docket Nos. 43-44).[1] Plaintiff filed his Response on December 18, 2006 (Docket No. 58, 69-76), and defendants filed their Reply Brief on January 22, 2007 (Docket No. 85).

### Background

The following are the facts viewed in the light most favorable to plaintiff.

---

[1] The parties consented to Magistrate Judge jurisdiction on June 14, 2006. (Docket No. 32). District Judge Richard L. Young entered an Order of Reference on June 19, 2006. (Docket No. 33).

**A.  Plaintiff's Employment with Styline**

At the time of his termination, plaintiff, Marshall Jones, worked at Styline Industries ("Styline") as a Warehouse Manager.  (Deposition of Marshall Jones ("Jones Dep.") at 34).  Styline is a manufacturer of office furniture headquartered in Huntingburg, Indiana.  (Affidavit of Donetta Abel ("Abel Aff.") ¶ 3).  Styline hired plaintiff as an hourly employee in 1997, and he was subsequently promoted to a salaried management position as Warehouse Manager in Plant 5 effective January 1, 2002.  (Jones Dep. at 17-18, 33-34; Abel Aff. ¶ 10).  At all relevant times, Styline has maintained a policy against sexual harassment.  (Abel Aff. ¶ 9; Jones Dep. at 20-22; Jones Dep. at Ex. 4).  And, as plaintiff admits, Styline holds its supervisory employees to a higher standard than those in non-supervisory positions and expects supervisory employees to set an example for other employees.  (Jones Dep. at 26-27).

**B.  Plaintiff's Discipline for Sexual Harassment of Elizabeth Crowe**

In June 2002, an hourly non-supervisory employee, Elizabeth Crowe ("Crowe"), complained to Styline's Human Resources Department that plaintiff was sexually harassing her.  (Jones Dep. at 41, 43; Abel Aff. ¶ 11).  Specifically, Crowe, who was married, complained that plaintiff frequently and repeatedly made unwanted propositions to her to engage in sexual conduct.  (Jones Dep. at 43; Abel Aff. ¶ 11).  Human Resources Director Donetta Abel ("Abel") interviewed Crowe regarding her allegations.  (Abel Aff. ¶ 12; Abel Aff. at Ex. 9).  Crowe told Abel that plaintiff frequently propositioned her to meet her in a "little hiding place" for sex after their co-workers had left work.  (Abel Aff. ¶ 12; Abel Aff. at Ex. 9).

Crowe reported that she rebuffed plaintiff's requests to have sex with him, but he continued to proposition her for approximately two weeks, calling her "chicken" for not accepting his invitations for sexual relations.  (Abel Aff. ¶ 12; Abel Aff. at Ex. 9).

Crowe also reported that on June 4, 2002, plaintiff called out to Crowe and a male co-worker as they left a meeting and that Crowe replied that this was no time to talk because they were there to work.  (Abel Aff. ¶ 13; Abel Aff. at Ex. 9). Plaintiff replied in a suggestive manner that he only wanted to talk to Crowe. (Abel Aff. ¶ 13; Abel Aff. at Ex. 9).  In an effort to get plaintiff to leave her alone, Crowe replied "fuck you."  (Abel Aff. ¶ 13, Able Aff. at Ex. 9). According to Crowe, plaintiff later responded by suggestively saying "you shouldn't make promises you can't keep."  (Abel Aff. ¶ 13; Abel Aff. at Ex. 9).  Based on her initial review, Abel concluded that Crowe's allegations were credible and that plaintiff had violated Styline's sexual harassment policy.  (Abel Aff. ¶ 15).

Abel instructed the Plant Manager, Louis Verkamp ("Verkamp"), who was plaintiff's supervisor, to give plaintiff the choice between signing a disciplinary written warning prepared by Human Resources or having Human Resources conduct a full investigation into Crowe's allegations, including conducting witness interviews.  (*Id.* ¶ 16).  Plaintiff decided to sign a written disciplinary notice in lieu of a full investigation.  (Jones Dep. at 41-43).  The written warning, signed by plaintiff on June 5, 2002, was issued for "[i]nappropriate conduct and behavior becoming a supervisor – specifically, unacceptable comments of a sexual nature

made to female associates." (*Id.* at 40-41; Jones Dep. at Ex. 7).  The disciplinary notice specifically informed plaintiff that:

> In the future there are to be <u>no</u> comments made that can in any way be construed as offensive or sexually harassing.  This includes actual invitations to sexual relations, comments with sexual implications, compliments or comments that cause discomfort, jokes of a sexual nature, etc.
>
> The next step of disciplinary action will be:  Immediate termination of your employment.

(Jones Dep. at Ex. 7).  Plaintiff denies Crowe's allegations but does not dispute that he was disciplined.  (*See* Jones Dep. at 40-44).  Plaintiff alleges that he was approached by Verkamp who told him to "sign the damn paper," that Verkamp informed plaintiff that he would likely be fired if he did not sign the paper, and that Verkamp had signed similar papers in his past and that only then did plaintiff sign the disciplinary notice.  (Jones Dep. at 41-44, 88).

**C.  The April/May 2004 Investigation and Discipline of Plaintiff**

Less than two years later, plaintiff was scheduled to attend a periodic anti-sexual harassment seminar for supervisors conducted by Styline on April 20, 2004.  (*Id.* at 45-46).  Plaintiff did not attend this scheduled training session because of attendance at a funeral.  (*Id.* at 46).  Upon learning that plaintiff was unable to attend the seminar, James Harris, Vice President of Risk Control, expressed concern to Verkamp that plaintiff should have been present because he was aware of possible inappropriate behavior by plaintiff and was concerned with plaintiff's interactions with female employees.  (Abel Dep. at 15-16; Deposition of James Harris ("J. Harris Dep.") at 23; Abel Aff. ¶ 17).  Verkamp relayed these

concerns to Human Resources.  (Verkamp Dep. at 37-38).  Separately, Purchasing

Manager James Spellmeyer also expressed concern to Human Resources about

plaintiff's behavior toward female employees.  (Abel Dep. at 16).  Abel recalled one

occasion where "a second management person made a comment in the hallway

that, of all individuals, Marshall Jones should have been present at the sexual

harassment training."  (*Id.*)  Based on this information and the prior allegations of

harassing behavior against plaintiff, Abel decided that an investigation was in

order.  Specifically, Abel explained:

> Marshall Jones was disciplined due to the fact that we had
> already experienced a lawsuit based on a supervisor behaving
> inappropriately.  When it was noticed that [plaintiff] was not at sexual
> harassment training, the investigation was conducted -- none of these
> females complained -- it was conducted to see if we had another
> situation occurring that we needed to take care of and get corrected
> before another lawsuit.  We did determine, based on their comments,
> that inappropriate behavior was occurring by a supervisor, so we
> addressed the situation and got the behavior corrected.
>
> It was not based on a sexual harassment complaint or to
> discipline him for a sexual harassment violation.  It was to correct his
> behavior as a supervisor and to take proactive measures to limit our
> liability for his actions.

(Abel Dep. at 99).

Abel and Jeff Eckert ("Eckert"), who was the Senior Vice President of

Manufacturing, began their investigation by interviewing Sheila Harris, who

informed them of comments by plaintiff that she felt were "inappropriate" – though

she was not offended herself and felt he had made these comments in a joking

manner.  (Deposition of Sheila Harris ("S. Harris Dep.") at 11-12).  Sheila Harris

did not approach Human Resources directly, but had been identified by her

husband James Harris as having potentially relevant information.  (*Id*.)  Sheila Harris informed Abel and Eckert that plaintiff had repeatedly asked her to let him know the next time that her husband was not at home or out of town and also indicated that she should have taken plaintiff on a recent vacation instead of her husband.  (*Id*. at 11; Abel Dep. at 20, 24; Abel Aff. ¶ 18).  Plaintiff admitted that he had told Sheila Harris that he would like to have gone on the recent vacation with her instead of her husband but that he had added that the reason for this was because he liked canoeing.  (S. Harris Dep. at 51).  The comments made by plaintiff concerning the recent vacation were made after Sheila Harris had invited plaintiff to come to her office to see the pictures of the vacation.

Sheila Harris also informed Abel and Eckert that plaintiff commented to her regarding how a female grocery store employee wanted to have sex with him.  (Abel Dep. at 20; Abel Aff. ¶ 18).  Additionally, Sheila Harris told Abel and Eckert that plaintiff would pull the waist of his pants out and pull up his shirt to show his stomach while stating to her "look at all the weight I've lost."  (Abel Dep. at 20, 32; Abel Aff. ¶ 18).  In response to further questions, Sheila Harris identified other female employees who she thought may have been subjected to inappropriate conduct by plaintiff.  (Abel Aff. ¶ 18).  Sheila Harris, Abel and Eckert also discussed her observations regarding plaintiff's behavior and comments with Verkamp because he was plaintiff's supervisor.  (Abel Aff. ¶ 18).  Sheila Harris did not, however, make any formal complaint about plaintiff's behavior.  (S. Harris Dep. at 11-12).

After consulting with Eckert, and at his direction, Abel conducted a more in-depth investigation into plaintiff's comments and conduct towards other female employees.  (Abel Dep. at 17, 23).  Abel contacted several women, none of whom had come to Abel's office on their own or had ever made any complaint against Jones.  (Abel Dep. at 22, 27).  According to Abel, her investigation revealed numerous female employees who reported inappropriate conduct of a sexual nature by plaintiff.  (Abel Aff. ¶ 19; Abel Dep. at 20, 24, 66-70; Abel Dep. at Ex. 11).  Female employees reported that plaintiff engaged in exaggerated compliments about their appearance while looking them up and down in a sexually leering manner as the "compliment" was made.  (Abel Aff. ¶ 20; Abel Dep. at 20, 24, 32, 66-70; Abel Dep. at Ex. 11).  Diana Rohlman reported that plaintiff had made comments regarding the size of her breasts.  (Abel Dep. at 29).  Jane Kays advised Abel that plaintiff had propositioned her to engage in sexual relations on a load of pallets.  (Abel Dep. at 66-67).  Abel alleges that she found the allegations of the interviewed employees to be credible.  (Abel Aff. ¶ 20).

Prior to this "investigation," Styline had never investigated any other supervisor about whom no complaint had been filed.  (Abel Dep. at 22-23, 31).  Abel did not talk to plaintiff during the "investigation."  (Abel Dep. at 26).

As a result of her investigation, Abel created a memo to Verkamp, Eckert and Earl Childress, the Vice President of Human Resources, summarizing her findings and recommendations and explaining:

> An investigation regarding various reports of inappropriate behavior displayed by Marshall Jones was conducted on May 4 - 6 by the Human Resource Department.  Following is a list of the results of that

investigation.  While noting that these are alleged incidents, several of the allegations have been witnessed by at least one other person. Eight individuals were interviewed during the course of the investigation.

Marshall has made comments to various administrative female employees that are apparently intended to be compliments, however, are found somewhat offensive or annoying due to the demeanor in which these comments are made.  Such demeanor has included obvious surveying of the females' bodies with his eyes and using such words as 'sexy' or overly stressing the statements made.  These comments have been made on a regular basis.

Marshall has made off-hand jokes to female administrative employees about 'meeting' outside the workplace or 'getting married'.  While all of said female employees believed that Marshall was only joking and would not carry through with any such invitations, if accepted, the behavior was still construed as inappropriate.

Marshall has made suggestive comments to female administrative employees that a reasonable person would construe as propositions for sexual activities, however, no direct statements of any type, other than hearsay, were reported by any of the individuals interviewed.

Some of the individuals who were interviewed relayed information regarding specific comments of a more severe nature that had been made by Marshall to various production female employees.  All of said information provided was admitted hearsay.  Each one of the individuals mentioned as having been the recipients of these comments was interviewed and discounted the information provided.

There was behavior reported by individuals interviewed that was supposedly witnessed by a specific other individual.  When said individual was then interviewed, the claim was not supported.  One of the individuals interviewed would not or could not give specific examples of comments made, even though requested to do so several times.

**RECOMMENDED ACTION**

It is my recommendation that Marshall Jones be allowed to continue his employment with Styline Industries as a salaried supervisor at Plant 5 with the following justification:
•    The written warning that Marshall received for similar behavior, which stated immediate termination would occur if similar

-8-

behavior were reported in the future, was administered two years ago.

- The behavior for which he received the first warning was never investigated or substantiated.
- The first warning was not administered or witnessed by the Human Resource Department to ensure that Marshall understood the seriousness of the alleged behavior and the Company's expectations regarding his future conduct.
- Marshall was unable to attend the most recent sexual harassment training due to a death in the immediate family; although, let it be noted, he has received training in the past.
- Certain reports concerning Marshall were found to be false or exaggerated.
- None of the reported behavior was towards his subordinate employees.
- We trust Louis' judgement [sic] of Marshall's otherwise valuable contribution to the Company.

It is also recommended that Marshall's continued employment be subject to the following conditions:

- A documented corrective action conference with Marshall be conducted by the Human Resource Department to ensure that Marshall is aware of the fact that his job is in jeopardy, it is believed that he has behaved in a way unbecoming and unacceptable of a supervisor, and any future behavior of any such type will not be tolerated and will result in immediate termination.  By the end of the conference, he will know that he is fortunate to still have his job, and he will know that, although he is being allowed to keep his job, it is on the line.  Marshall will also be made aware of and will acknowledge the fact that, regardless of any other employee's behavior, albeit of a similar nature, he will be held to a higher standard due to his supervisory position, the Company's awareness of his specific behavior and the Company's appropriate actions with regards to his misconduct.  He will understand that any other employee's misconduct will be dealt with in an appropriate manner, if and when the Company is made aware of such misconduct, and will have no bearing on Marshall's employment status with Styline, nor will the existence of any such misconduct allow for the continuance of or excuse Marshall's past behavior.
- Marshall will receive sexual harassment training at the earliest possible date and will demonstrate his awareness and comprehension of the content of the training sufficiently enough to convince our legal counsel of the advisability of continuing his employment.

- Marshall will no longer have the ability to discharge or administer disciplinary action to any subordinate employee for a period of one year, if he has such authority at this time. At the end of one year, upon review, this authority may be reinstated.
- Marshall will not be allowed to directly supervise any female employee to remove the risk of any quid pro quo sexual harassment claim(s) should the Company be mistaken in its belief that Marshall will immediately correct his inappropriate conduct. He may provide direction to the female employees currently in his department, and they will be required to comply with such job-related directions, but they will understand that Louis, or whoever may be deemed appropriate, is considered their immediate supervisor.

(Abel Dep. at Ex. 11).  Based on the results of the investigation into plaintiff's behavior, Styline determined that he had engaged in inappropriate, sexually harassing conduct and comments towards female employees.  (Abel Dep. at 65-66; Abel Aff. ¶ 22).  While defendants allege that plaintiff could have been discharged for his actions, Styline decided to give him one last chance.  (Jones Dep. at 51-52; Jones Dep. at Ex. 7; Abel Aff. ¶ 22).  Abel, explaining the decision, stated that "in our meeting it was debated [whether or not to keep plaintiff].  [Eckert] could not decide whether, based on [plaintiff's] previous warning, whether it was right to keep [plaintiff] or terminate him.  It was a collective decision that we decided to retain his employment after the initial investigation."  (Abel Dep. at 106).

Abel and Verkamp met with plaintiff on May 13, 2004, to discuss the results of the investigation and to administer a warning that any further such conduct would result in termination of employment.  (Jones Dep. at 51-52). Unlike the circumstances of the previous investigation, plaintiff did not sign a written disciplinary notice.  (*Id.*)  No formal disciplinary action was taken against

plaintiff, and no written document exists which shows discipline was administered at this time.  (Jones Dep. at 51).  However, plaintiff admits that, at this meeting, he was informed of the investigation and acknowledges that he was to no longer have authority over female employees.  (*Id.* at 52).

## D.  Styline's Decision to Terminate Plaintiff's Employment

In August 2004, Styline received another complaint against plaintiff.  (Abel Dep. at 45; Abel Aff. ¶ 24).  Cindia Ingle ("Ingle") complained to Abel that she was being harassed by plaintiff.  (Jones Dep. at 61-62; Abel Aff. ¶ 24).  Further, Ingle complained that plaintiff was treating her in an overly harsh manner, including engaging in unnecessary cussing and screaming.  (Abel Aff. ¶ 25; Abel Dep. at 37-38).  Ingle also reported an incident of unnecessary touching and an incident of implied sexual invitation.  (Abel Aff. ¶ 25; Jones Dep. at 61-62; Abel Dep. at 34-37).  Specifically, Ingle reported that plaintiff had inappropriately touched her shirt and back.  (Abel Dep. at 34-35; Abel Aff. ¶ 25; Jones Dep. at 82-83).

Additionally, Ingle reported to Abel that, while she was riding in a vehicle with plaintiff, he stated that they should pull over and "park," a statement that she construed to suggest sexual activity.  (Abel Dep. at 37-38; Abel Aff. ¶ 25).  Abel and Verkamp discussed Ingle's allegations with plaintiff, and he partially corroborated them by admitting to touching the tag on the back of Ingle's shirt (though he claimed that he was simply tucking the tag back inside Ingle's shirt because he expected his employees to look tidy).  (Jones Dep. at 82-83; Abel Dep. at 35-36, 40).  Ingle herself had been disciplined for sexually inappropriate behavior towards co-worker Jeff Deno.  Ingle was not fired.  (Eckert Dep. at 52-

53).  Vercamp and Abel both told plaintiff that they believed Ingle was lying, but they could not take a chance of her getting a lawyer and taking the company to court.  (Jones Dep. at 86.)

Based on Styline's investigation and plaintiff's partial admission of Ingle's complaint, along with his history of prior discipline for sexually harassing behavior, Abel alleges that Styline concluded that Ingle was more credible and that plaintiff had engaged in another violation of Styline's policy against sexual harassment.  (Abel Aff. ¶ 26).  As a result of this conclusion, Styline made the decision to terminate plaintiff's employment on August 23, 2004.  (Abel Dep. at 14, 21, 40; Abel Aff. ¶ 27).

Styline alleges that its decision was based on Ingle's complaints of harassing behavior and plaintiff's history of being the subject of repeated allegations of sexually harassing behavior, and had nothing to do with his gender.  (Abel Aff. ¶ 26).  After plaintiff's termination, Styline replaced him with another male supervisor, Dave Stockburger.  (Abel Aff. ¶ 28).

**E.  Other Instances of Sexual Harassment by Styline Employees**

Plaintiff provided evidence of inappropriate e-mails that involved some of the individuals who participated in the investigations of his behavior.  John Deno, Jeff Lagenour, Jason Baker, Maggie Kerkhoff, Lisa Hagan and David Braun each participated in sending e-mails that included inappropriate images and/or jokes of a sexual nature.  (*See* Abel Aff. at Exs. 1-6).  Each of these individuals were subsequently disciplined by Styline, albeit nearly one-and-a-half years after the e-mails were sent and after plaintiff was terminated.  (*See id.*).

**F.  Plaintiff's EEOC Charge**

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 1, 2004.  (Complaint at Ex. A). In his EEOC charge, plaintiff alleged that he was the victim of sex-based discrimination.  (*Id.*)  Specifically, plaintiff alleged that he had suffered from disparate treatment in that "Styline treated me different from and worse than the female employee who lied about me to the company; she still has her job; I do not. The company knows she lied about my behavior."  (*Id.*)

**G.  Plaintiff's Claims**

After receiving his Right to Sue letter from the EEOC, plaintiff timely filed this suit in which he reiterated his disparate treatment claim and also alleged that Styline "created a sexually hostile environment for Plaintiff which unreasonably interfered with Plaintiff's ability to do his job and which resulted in the discriminatory termination of Plaintiff on August 23, 2004."  (Complaint ¶¶ 10, 14).  Plaintiff also brought a claim of defamation against Styline and the individual defendants.

Defendants filed the pending Motion for Summary Judgment alleging that plaintiff has failed to demonstrate a prima facie case of sex-based discrimination or that plaintiff has failed to show that Styline's reasons for terminating him were pretextual.  In addition, after plaintiff filed his Response to Defendants' Motion for Summary Judgment, defendants argued that plaintiff's claim of sexual harassment/hostile work environment was not raised in his EEOC charge and must be dismissed.  Defendants also argue that plaintiff's defamation claims

against each defendant must be dismissed because plaintiff has failed to demonstrate the necessary elements of a defamation case.  For the following reasons, the Court agrees with defendants and concludes that all of plaintiff's claims must be dismissed.

## **Legal Standard**

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The motion should be granted so long as no rational fact finder could return a verdict in favor of the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Thus, a court's ruling on a motion for summary judgment is akin to that of a directed verdict, as the question essentially for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  When ruling on the motion, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences therefrom in that party's favor.  *Id.* at 255.  If the nonmoving party bears the burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e); *see also Silk v. City of Chicago,* 194 F.3d 788, 798 (7th Cir. 1999).  Lastly, the moving party need not positively disprove the nonmovant's case; rather, it may prevail by

establishing the lack of evidentiary support for that case.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

**<u>Analysis</u>**

Plaintiff brought his claims of disparate treatment and harassment against Styline under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Plaintiff also brought a claim of defamation against all defendants.

**A.  Plaintiff's Title VII Claims**

Under Title VII it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.

In order to bring such a Title VII claim, an individual must first "file a timely charge with the EEOC encompassing the acts complained of as a prerequisite to filing suit in federal court."  *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 863 (7th Cir. 1985).  Hence, a plaintiff attempting to bring a claim of discrimination cannot bring such a claim if it was not included in his EEOC charge.  *Cheek v. Western and Southern Life Ins. Co.,* 31 F.3d 497, 500 (7th Cir. 1994).  Put another way, "[a]n aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination."  *Rush v. McDonald's Corp.,* 966 F.2d 1104, 1110 (7th Cir. 1992). The purpose of this requirement is two-fold:  it gives the EEOC and the employer

an opportunity to settle the dispute, and it puts the employer on notice of any charges against it.  *Id.*  Although this rule is not jurisdictional, it does provide a condition precedent with which Title VII plaintiffs must comply.  *Babrocky,* 773 F.2d at 864.

Because many people who bring EEOC charges do so without the assistance of counsel, the courts have concluded that allegations in a complaint are permissible so long as they are "like or reasonably related to the allegations of the [EEOC] charge and growing out of such allegations."  *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538 F.2d 164, 167 (7th Cir. 1976) (en banc).  In order to satisfy this requirement, the complaint and the EEOC charge "must, at minimum, describe the same conduct and implicate the same individuals."  *Cheek,* 31 F.3d at 501.  Hence, the Seventh Circuit has concluded that "[n]ormally, retaliation . . . discrimination, and . . . harassment charges are not like or reasonably related to one another to permit an EEOC charge of one type of wrong to support a subsequent civil suit for another."  *Sitar v. Indiana Dept. of Transp.,* 344 F.3d 720, 726 (7th Cir. 2003) (internal quotations omitted).  Only where the claims are "so related and intertwined in time, people, and substance that to ignore that relationship for a strict and technical application of the rule would subvert the liberal remedial purposes of the Act," will instances not described in the EEOC charge be considered.  *Kristufek v. Hussmann Foodservice Co., Toastmaster Div.,* 985 F.2d 364, 368 (7th Cir. 1993).

In the instant case, plaintiff's EEOC charge raises a straightforward charge of disparate treatment.  However inartfully it was pled, plaintiff alleges that he was

terminated for sexual harassment while other individuals were not.  While plaintiff alleges disparate treatment in his EEOC charge, the claim that he is pursuing in this suit resembles a sexual harassment/hostile environment claim.  Plaintiff alleges in his Complaint that "Styline and agents thereof have continuously and intentionally discriminated against Plaintiff on account of his gender, including the creation and maintaining of a sexually hostile environment . . . ."  (Complaint ¶ 9).  Plaintiff continued this line of argument in his Response to Defendants' Motion for Summary Judgment when he stated that his "discharge by Defendant Styline is part of harassment on account of his gender which Styline began at the end of April 2004 and continued until his discharge on August 23, 2004." (Plaintiff's Response to Defendants' Motion for Summary Judgment at 1). Nowhere in plaintiff's Response does he provide the elements of a disparate treatment claim, nor does he ever attempt to suggest who the similarly situated employees were that were treated more favorably than plaintiff.

Because plaintiff's Complaint alleges a hostile work environment while his EEOC charge states a claim of disparate treatment, plaintiff's hostile environment/sexual harassment claim must be dismissed as outside the scope of his EEOC charge.  A claim of disparate treatment would only focus on whether other women who had been previously disciplined for inappropriate comments and then had subsequently been accused of sexual harassment were treated more favorably than plaintiff.  Whereas, plaintiff's hostile environment claim alleges that Abel and Eckert systematically engaged in an effort to make life miserable for plaintiff from April to August 2004.  The two claims involve entirely different facts

that occurred at different times and involve different people.  Hence, plaintiff's claim of harassment is not "like or reasonably related to" his claim of disparate treatment and must be dismissed.  And, even if plaintiff's hostile environment claim were to survive this initial inquiry, the Court concludes that plaintiff's claim would still fail.  In order for plaintiff to demonstrate the existence of a hostile work environment, "[t]he conduct must . . . be so severe or pervasive as to alter the terms or conditions of the employment relationship."  *Smith v. Sheahan,* 189 F.3d 529, 533 (7th Cir. 1999).  We do not find plaintiff being subjected to two investigations of sexual harassment, even if they were unwarranted, to be the type of severe or pervasive conduct sufficient to show the existence of a hostile environment.  For these reasons, plaintiff's hostile environment/sexual harassment claim under Title VII is **DISMISSED.**

Plaintiff's disparate treatment claim reaches the same fate.  While it very well may be that plaintiff has already abandoned his claim of disparate treatment by not properly arguing it in his Response, the Court still wishes to address the merits of that particular claim.  In order to demonstrate disparate treatment on the part of Styline, it is imperative that plaintiff show that other similarly situated females were treated more favorably.  "This requires the plaintiff to show not only that the employees reported to the same supervisor, engaged in the same conduct, and had the same qualifications, but also show that there were no differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them." *Ineichen v. Ameritech,* 410 F.3d 956, 960-61, (7th Cir. 2005) (internal citation and quotations omitted).  That is, plaintiff must show that there were

other female supervisory employees who were found to have violated Styline's sexual harassment policy on more than one occasion but were not terminated. Here, plaintiff has provided evidence that six Styline employees produced or distributed e-mails that constituted a violation of Styline's sexual harassment policy but were not terminated. However, this showing alone is not adequate to show disparate treatment. First, four of the employees who were responsible for the e-mails were male. Second, the remaining two female employees were both non-supervisory employees and plaintiff has also provided no evidence that either of these females had already been disciplined for sexual harassment on a prior occasion (as plaintiff had). Because plaintiff has failed to show similarly situated female employees who were treated more favorably than plaintiff, his Title VII disparate treatment claim is also **DISMISSED.**

## B.  Plaintiff's Defamation Claims

Plaintiff also argued in his Complaint that all of the defendants made statements about him that were defamatory.[2]  Plaintiff has since explicitly abandoned his defamation claim against Sheila Harris. (Brief in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment at 21). Thus,

---

[2]In addition to their Motion for Summary Judgment, defendants also filed a Motion for Partial Judgment on the Pleadings on plaintiff's defamation claims alleging that plaintiff's Complaint provided insufficient facts to support his claims of defamation. (See Brief in Support of Defendants' Motion for Partial Judgment on the Pleadings). Because plaintiff's Response to said motion includes citations to deposition testimony as well as affidavits, and because plaintiff's defamation claim is addressed in defendants' Motion for Summary Judgment, the Court will address the merits of plaintiff's defamation claim rather than ruling on Defendants' Motion for Partial Judgment on the Pleadings.

the Court will only address the claims of defamation against the remaining defendants.

In Indiana, in order to make a showing of defamation, plaintiff must prove the existence of a "communication with defamatory imputation, malice, publication, and damages." *Davidson v. Perron,* 716 N.E.2d 29, 37 (Ind.Ct.App. 1999). However, certain communications are protected by a "qualified privilege," and the Indiana Supreme Court has noted that:

> Intracompany communications regarding the fitness of an employee are protected by the qualified privilege, in order to accommodate the important role of free and open intracompany communications and legitimate human resource management needs. The privilege protects personnel evaluation information communicated in good faith.

*Schrader v. Eli Lily and Co.,* 639 N.E.2d 258, 262 (Ind. 1994) (internal citation omitted). While a defendant can assert this privilege, a plaintiff can show that the privilege has been abused by carrying his burden of providing evidence that: (1) the message was primarily motivated by ill will; (2) there was excessive publication of the message; or (3) the statement was made without belief or grounds for belief in the truth of the statement. *Id.*

In his Response to Defendants' Motion for Summary Judgment, plaintiff concedes that the only statement that he is alleging was defamatory was a statement by Abel. Plaintiff alleges that Abel told Verkamp that Sheila Harris had "made a complaint against him knowing [Sheila Harris] had not." (Plaintiff's Response to Defendants' Motion for Summary Judgment at 21). Here, the alleged statement is clearly protected by the intracompany communications privilege. It

-20-

was made by a Styline employee within human resources to plaintiff's supervisor. Thus, the only question that remains is whether or not the privilege was abused. The Court concludes that it was not. First, there clearly was not "excessive publication" as the only instance of publication that plaintiff alleges was from Abel to Verkamp. Second, plaintiff has not met his burden of showing that the primary purpose of this communication was "ill will." Plaintiff has failed to provide evidence to contradict defendants' claim that they were engaged in a legitimate investigation of plaintiff's behavior in May 2004. Third, plaintiff has not shown that Abel made the statement when she knew or should have known that it was not true. While Sheila Harris did not technically file a formal complaint of sexual harassment, her testimony is that she reported to Abel that plaintiff did make inappropriate comments to her. (*See* S. Harris Dep. at 11-12). Even assuming that Abel's statement to Verkamp that Harris had "made a complaint" happened exactly as plaintiff claims it did, plaintiff cannot meet his burden of showing that Abel's statement amounted to making a statement that she knew or should have known was not true. Because Abel's comments are covered by a privilege and because plaintiff has failed to show that the privilege was abused, plaintiff has failed to meet all of the elements of his defamation claim against Abel. Additionally, plaintiff alleges that Eckert defamed him by ratifying Abel's statement to Verkamp. For the same reasons that plaintiff's defamation claim against Abel fails, so too does his claim against Eckert.

-21-

## Conclusion

For the reasons outlined above, Defendants' Motion for Summary Judgment is **GRANTED.**  All of plaintiff's claims are **DISMISSED.**  The pending Defendants' Motion for Partial Judgment on the Pleadings is **DENIED, as moot.**

**SO ORDERED.**

**Dated:**  March 23, 2007

WILLIAM G. HUSSMANN, JR.
Magistrate Judge

**Electronic copies to:**

Virginia M. O'Leary
O'LEARY & ASSOCIATES
office@olearylaw.net

Jeffrey Scott Beck
BAKER & DANIELS
jeffrey.beck@bakerd.com

Edward E. Hollis
BAKER & DANIELS
eehollis@bakerd.com